Nott, J.,
dissenting:
It has been the misfortune of that branch of public justice which is administered only by means of this court, that statutes enacted before the court existed have entered into and bound the judicial relief which it decrees; that provisions scattered about through various acts of Congress, designed originally to assign powers and duties among public officers and regulate their official action, have become obligatory as a part of the law of the land upon every man having commercial dealings with the Government.
Thus one statutory provision enacts, that no contract or purchase shall be made “ unless the same he authorized hy law, or he under an appropriation adequate to its fulfilment,” {Act 2d March, 1861,12 Stat. L., p. 220, § 10 ;) another, that “ all purchases and contracts for supplies or services,” 11 when the public exigencies do not require the immediate delivery,v “ shall he made hy advertising a sufficient time previously for proposals,” (ibid.;) a third, that when a military emergency exists “ requiring the immediate procurement of supplies for the necessary movements and operations of an army,” the emergency must be declared by the commanding officer, and then the chief quartermaster may “procure supplies during the continuation of such emergency, hut no longer,” (Act Ath July, 13 Stat. L., p. 394, § 4;) a fourth, that every contract in some of the Executive Departments must “ he reduced to ivriting and signed hy the contracting parties with their names at the end thereof,” (Act 2d June, 1862,12 Stat. L., p. 411, § 1;) a fifth, that no “ contract,” nor “ any interest therein, shall he transferred,” and that “ any such transfer shall cause the annulment of the contract,” (Act 11th July, 1862,12 Stat. L., p. 596, §14;) a sixth, that “ all transfers and assignments ” u of any *491 claim tipon the United States, or any part or share thereof, or any interest therein,” “ shall he absolutely null and void,” unless tbe same be made and executed at a time and in a manner pointed out by tbe statute; and all of these statutory provisions have been found fatal to causes of action which, as between man and man, would have been adjudged meritorious and valid.
Immediately after the xe-organization of this court it was supposed that the rule regarding the effect to be given to a contract with the Government is the same as between individuals. (Gilbert & Seeor’s Case, 1 0. Cls; It., p. 28.) But, subsequently, in the Floyd Acceptance Case, (ibid., p. 270,) it was held that there is this difference between individuals and the Government ; that the former are liable 'to the extent of the power that they have apparently given to their agents, while the Government is liable only to the extent of the power it has actually given to its officers. The Supreme Court, in the same case, pushed this doctrine further, and held, though by a divided court, that uour statute-books are filled with acts authorising the malting of contracts with the Government through its various officers and Departments, but in every instance the person entering into such a contract must look to the .statute under which it is made and see for himself that Ms contract comes within the terms of the law.” (7 Wall. B., p. 680.)
The citizens of the United States live and move under their respective State laws and know little of the Federal statutes; but under this decision of the Supreme Court, ignorantia legis exeusat neminem; the officers of the Government are but special agents with but limited powers and circumscribed discretion ; special agents cannot vary their instructions nor exceed their authority; the instruction and authority are written in the statute-books, and the person who would enter into a contract with the officers of the Government “must look to the statute under which it is made and see for. himself that his contract comes within the terms of the law.” And thus it comes that a laborer who has chopped wood for. the Government cannot recover the contract price because his contract was not in writing, (Henderson’s Case, 4 O. Cls. If.., p. 75;) that a farmer who has sold and delivered hay must lose it because he had before performance transferred an interest in the contract, (Wamless’s Case, 6 C. Cls. B., p. 123;) that a builder who has built barracks for the army should not be paid because he dealt with an offi *492 cer of engineers instead of an officer of tbe Quartermaster Department, (Travers’s Case, 5 C. Ols. It., p.329;) that a contractor who furnishes fuel for the troops should not receive the price of it because the military emergency that required it was not declared by the commanding general, (MeKenney’s Case, 4 0. Ols. B>., 537;) that a grain-dealer who has delivered his corn to a quartermaster must stand the loss of its destruction in the hands of Government officers because his agreement was not founded on advertisements and proposals. (Adams’s Case, ante, p. —.)
These are cases of extreme hardship, but they do not illustrate the ruinous effect of these statutes upon contracts and transactions meritorious and just in themselves, more completely than the case at bar.
The only point determined by the decision — that is to say, the only point in the case upon which the majority of the judges who pronounce the judgment are agreed — is that the claimant cannot recover upon his'theory of parol agreement, consummated by performance on the .one side and the giving of a formal official voucher on the other. The facts upon which the claimant presents his theory of the case, and upon which that point of the decision rests, are these: A citizen of the United States in good faith agrees, not with some irresponsible subordinate unauthorized agent, but with the chief quartermaster of a great military department, for the sale of six hundred bushels of corn. The contract is not in writing, but by parol. Its object is not unlawful, but to support the wagon trains of the Government engaged in moving military material. The citizen, in good faith and within the prescribed time, delivers the six hundred bushels of corn at the appointed place. It is found by the court to be good, sound, and merchantable corn, and, moreover, it remains for three weeks in a Government warehouse, awaiting Government inspection. At the end of that time the chief quartermaster sends his clerk to examine it, with authority to accept it. The clerk weighs it, accepts it, and gives to the vendor a receipt for it. The vendor carries the receipt to the chief quartermaster, who ratifies the action of the clerk by issuing a formal official voucher, at the agreed price, which, moreover, is the fair market value of the article. The corn, meanwhile, goes into the actual possession of the Government’s agents; some is fed to the Government *493 teams; some is destroyed by tbe leaking of tbe Government warehouse ; none is ever returned to tbe vendor, though a portion of it, spoiled and worthless, is tendered to him at a point one hundred and fifty miles distant from the place of sale and delivery. And upon this presentation of the case a majority of the judges hold that the citizen’s claim for recovery “ is in direct contravention to three acts of Congress.”
Wherefore I conclude that if a cause of action so just, so simple, and so completely established by well-settled principles of mercantile law, cannot be maintained against the Government when the Government goes into the market and has commercial dealings with its citizens, but, against all received principles of law and morality, is barred by no less than “three” acts of Congress, the time has come when Congress should radically reform the statute law of the United States.
The doctrine laid down by the Supreme Court that uour statute-books are filled with acts authorizing [“restricting” would be the better word] the making of contracts with the Government, but in every instance the person entering into such a contract must look to the statute under which it is made and see for himself that his contract comes within the terms of the lato,” may be well enough as an abstract theory, but the practical operation of these statutes is such that the wary can take advantage of the unwary; that the citizen finds in them, instead of protection, a snare, and that they fail to accomplish the purpose of securing safety and justice which is the purpose of all laws.
If doubt can still exist as to the necessity of statutory revision, a conclusive demonstration is afforded by those cases which have been reviewed by the Supreme Court. They may be taken as a type of the whole in the first place; and, in the second place, are unquestionable expositions of the existing law, in being decisions of the court of last resort. The whole number of decisions thus far rendered (putting aside the abandoned or captured-property cases, which rest on special legislation) is thirty-nine. Of that large number there are but three reversals against the Government, (Wm. Clark, ante, p. 24;. Garrison, p. 78; Reeside, p. 89;) and but three affirmances in favor of the claimants, (Hosmer, p. 141; Russell, p. 227; Burns, p. 219.) Of those thirty-nine decisions, twenty-nine give judgment against the claimant by decrees absolute and final, (DeGroot, p. 2; Alire, p. 27; Adams, p. 58; Dorsheimer, p. 43; Floyd Ac *494 ceptance Cases, p. 65; Gordon, p. 46; Grant, p. 53; Kellogg, p.56; Kendall, p. 33; Nicholl, p. 36; Gilbert & Secor, p. 113; Gilmore, p. 109; Lane, p. 97; Parish, p. 110; Stansbury, p. 87; Bonner, p. 133; Filor, p. 119; Meade, p. 161; Merrill, p. 155; Mahoney, p. 183; Ward, p. 187; Reed, p. 195; Clark & Co., p. 32; Child, Pratt & Fox, p. 158; Wormer, p. 257; Clyde, p. 262; Perrin, p. 223; Scott, p. 224; Alexander, p. 205;) only six are in favor of the claimant, [Garrison,Peeside, Speed,Bosmer, Pussell,and Burns; two are in the nature of a venire de novo, Wm. Ciarle, p. 24; Tillou p. 18;) and two affirm judgments nominally in favor of the claimants, but substantially in favor of the Government, (Gibbons, p. 105; and Kimball, p.234.)
It may also be observed that these thirty-nine cases fall into three classes:
1. There are twelve cases of a character not strictly identical with ordinary actions on contract — suits brought by soldiers for pensions, by officers for pay — depending on statutes rather than on transactions. Of these, eleven decisions are for the Government, and one for the claimant.
2. There are fourteen cases decided on what may be termed ordinary legal principles, i. e., applicable to suits where the Government is not a suitor, and, of these, nine are for the Government, and five for the claimants.
3. There are thirteen cases, all of which are for the Government, where the decisions avowedly stand on the ground that the defendant is the Government; that is to say, they are eases where a plaintiff suing an individual in an ordinary court of law or equity might obtain legal redress; but where a claimant suing the Government is without legal redress, either because the judiciary of the United States are without adequate jurisdiction, or because the Government, as a contractor, possesses powers and immunities that could not be maintained were the Government an individual or a corporation.
For my own part, I think that this ease will render res judicata every construction of these statutes tending to destroy ordinary agreements with officers of the Government. Believing that what is res judicata is law, and agreeing with the President that the rigid enforcement of bad laws is the surest method to secure their repeal, I shall offer hereafter no opposition to the application of these decisions to other cases, nor *495 hesitate to carry out tbeir doctrine to the inevitable consequence.
There is also an early statute “ concerning public contracts,” which prohibits members of Congress from holding or enjoying uin whole or in part” any contract with the Government, and which expressly provides that every contract in which a member of Congress participates shall be “ absolutely void and of no effect.” The same statute then declares that in every contract made by officers of the Government on its behalf, u there shall be inserted an express condition that no member of Congress shall be admitted to any share or part of such contract or agreement, or to any benefit to arise therefrom.” (Act 21 st April, 1808, 2 Stat. L., p. 484.) This statute has never been brought before the present court, and seems to have escaped the vigilant attention of the Attorney-General. I perceive no distinction in principle between it and others that have been held to be mandatory upon the contractor, and not merely directory to the agents of the Government. On the contrary, the statute appears to me to be more clearly mandatory than any of the others. The contracts which it is directed against are declared to be “ absolutely voidf and future contracts were required to contain an express provision that no member of Congress should be subsequently admitted to any share therein. Such a provision thus inserted would bind the contractor and not the officer. It would form the contractor’s agreement not to admit members of Congress to a participation in his contract. The statute, according to the construction given to other statutes, says to the contractor, “The Government will not enter into an agreement with you, unless you will agree that no member of Congress shall, directly or indirectly, become a beneficiary under the Government.” And, in consonance with previous decisions, we must hold that no officer of the Government can waive this condition, and that every person dealing with the Government has received through the statute notice of the limited.authority of the officer and the absolute necessity of the condition. When that statute shall be thus enforced, the cordon of statutory defenses will be complete.
So far as this case is concerned, my conclusions are:
1. That the contract, being unfulfilled, it was competent for the defendants’ agents to waive the forfeiture by lapse of time, under the decision of this court in Lester1 s Case, (1C. Ols. R., p. *496 52,) and of the Supreme Court in Clarlc’s Case, (6 Wall. B., p. 543.)
2. That the parties mutually referred the delivery of the corn to the written contract ■ both before and after the transaction, and it being perfectly legal and proper for them so to do, the sale, as a delivery under the contract, should be sustained.
3. That when the claimant delivered “ good, sound, merchantable corn” at the agreed place, and left it in the Government warehouse for inspection, he had fully performed all that the contract required him to do, and that the defendants were bound within a reasonable time to inspect the corn, and notify the claimant of its rejection, if it were rejected.
4. That in either alternative, whether the corn was delivered under the old express contract or under a new parol agreement, the defendants did, in law, accept it when their agents toot it into their actual custody, and put it to the use of the United States, so that the vendor could not reclaim it as his own; and the use of a portion of the corn in the military service of the defendants, and the transportation of the larger part of it one hundred and fifty miles from the place of sale and delivery by their officers and agents, confirms the acceptance of the whole, and establishes, so far as the vendor is concerned, the user of the defendants.